The Honorable Benjamin H. Settle

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
8                              AT TACOMA

9   UNITED STATES OF AMERICA,

                                        NO. CR 15-5201 BHS
10              Plaintiff,

                                        DEFENDANT PRICE'S SENTENCING
11      v.                              MEMORANDUM

12   RUSSELL WAYNE PRICE,

13              Defendant.

14

15

16

17

18

19

20

21

22

23

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 1

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................ 3

II.   STATEMENT OF THE CASE ................................................................... 4

III.  ADVISORY SENTENCING GUIDELINES ............................................ 5

IV.   THE RECOMMENDATION OF UNITED STATES PROBATION ......... 5

V.    DEFENSE RECOMMENDATION ........................................................... 5

VI.   THE LEGAL BASIS FOR THE COURT'S WIDE DISCRETION TO IMPOSE AN APPROPRIATE SENTENCE THAT IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE PURPOSES OF 18 U.S.C. § 3553(a), IN LIGHT OF THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT AND THE NATURE AND CIRCUMSTANCES OF THE OFFENSE. ........................................... 6

    A.   After *United States v. Booker*, 543 U.S. 220 (2005), the United States Sentencing Guidelines are Advisory Rather Than Mandatory. .......................... 6

    B.   The Court Must Impose a Sentence that Is Sufficient, but Not Greater than Necessary, to Achieve the Goals of the Sentencing Statute. ............................... 6

VII.  THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT ....... 7

    A.   Early Life ............................................................................................. 8

    B.   Long Beach Shavings Company ........................................................... 8

    C.   Personal Life ........................................................................................ 9

VIII. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ............... 15

    A.   Wayne Price Made His Peace With LBSC Before LBSC Precipitously Moved Its Operations To Texas ......................................................... 17

    B.   The Government's Statement of the Offense Conduct in its Sentencing Memorandum is Unfair. ....................................................................... 21

IX.   ACCEPTANCE OF RESPONSIBILITY .................................................. 23

X.    RELATED DEFENDANT ......................................................................... 23

XI.   A SENTENCE OF PROBATION IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE PURPOSES OF 18 U.S.C. § 3553(a) ............... 24

    A.   Mr. Price's Extraordinary Family Ties and Responsibilities Support the Recommended Sentence .................................................................. 25

    B.   Recidivism Rates Suggest that Individual Deterrence is not a Necessary Requirement of this Sentence. .......................................................... 26

    C.   Collateral Consequences of Conviction .............................................. 27

XII.  CONCLUSION .......................................................................................... 29

skellenger**bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

1

## I.    INTRODUCTION

2

Wayne Price has pled guilty to one count of filing a false tax return.  The Court should

3 impose probation and a no-jail sentence, substituting instead, if the Court deems it appropriate,

4 the imposition of an appropriate number of community service hours.  This is a sentence that

5 "is sufficient, but not greater than necessary," *Pepper v. United States*, 562 U.S. 476, 491

6 (2011), to achieve the goals of the sentencing statute because:

7
- In 2013, Wayne Price filed amended and corrected tax returns with the Internal Revenue Service (IRS) for all relevant years.

8

9
- Wayne Price paid to the IRS all income taxes owed for the relevant years in 2013, as well as all penalties and interest owed for the relevant years.

10
- When advised of the pending federal investigation in 2012, Wayne Price immediately and voluntarily contacted the investigating agent to give a full statement, then met personally with the agent and the Assistant United States Attorney to be debriefed, all without any promise of immunity or benefit to himself.

11

12

13
- Wayne Price voluntarily made peace with the company then known as Long Beach Shavings Company (LBSC) in 2013 by:

14
  - Paying to LBSC the disputed funds he had received from Bill Lonn on account of M&R Lumber;

15

16
  - Agreeing to a short period of unpaid leave and then resuming employment with LBSC after the LBSC declared that they had "forgiven" Wayne for any transgression;

17

18
  - Giving LBSC money to help LBSC manage the cash flow for the income taxes it owed on the disputed funds paid over to it.

19
- LBSC management expressed their satisfaction with Wayne Price's actions in May 2013 by requesting that he not be prosecuted for this conduct.

20

21
- When the LBSC management unilaterally moved the company to Conroe, Texas, Wayne Price resigned from the company to stay with his family in Southern California, where they had all grown up, and Wayne Price began his own business, Pacific Coast Shavings.

22

23

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 3

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

- Wayne Price cares for, and provides financial support for, his seriously ill adult son Chad Price, and Chad's daughter Leah, in his home.

- A custodial sentence would cause the collapse of Pacific Coast Shavings, the sole source of income for Wayne Price, his wife Cheryl, Chad, and Leah, and result in financial devastation for this family.

- Wayne Price is 61 years old, facing sentencing for his first criminal offense, has expressed his remorse for his crime, and there is no suggestion of any possibility of recidivism.

## II.     STATEMENT OF THE CASE

On April 16, 2015, Russell "Wayne" Price and his co-defendant Willis "Bill" Lonn were charged by way of Indictment with several counts of mail fraud, wire fraud, and money laundering.  Dkt. No. 1.  Mr. Price made his initial appearance and was arraigned on the Indictment on April 28, 2015.  Dkt. No. 17.

Wayne Price was released on Pretrial Services supervision, including several financial disclosure conditions, and the Pretrial Services Officer reports that he has been in full compliance with all conditions since that time, a period of approximately 19 months.

Mr. Price and the government ultimately reached a resolution, and on August 24, 2016, the government filed a Superseding Information (Dkt. No. 102), and then an Amended Superseding Information (Dkt. No. 103), charging Mr. Price with one count of filing a false income tax return, in violation of 26 U.S.C. § 7206(a).  Mr. Price pled guilty to that offense on August 25, 2016.  Mr. Lonn, on the other hand, proceeded to trial before this Court and was convicted of mail fraud, theft, and money laundering.

The government has agreed that the fraud and money laundering counts with which Mr. Price was originally charged are all to be dismissed at the time of sentencing on the motion of the government.  Dkt. No. 106.

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 4

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

## III.    ADVISORY SENTENCING GUIDELINES

The parties have agreed—and United States Probation concurs—that the relevant United States Sentencing Guidelines are as follows:

| | |
|---|---|
| Base Offense Level, § 2T1.1 and 2T4.1(D) (tax loss less than $40,000): | 12 |
| Failure to report income exceeding $10,000 from criminal activity, § 2T1.1(b)(1): | +2 |
| Acceptance of Responsibility, § 3E1.1: | -2 |
| **TOTAL OFFENSE LEVEL:** | 12 |

At 61 years old, Mr. Price has no criminal history. At a Criminal History Category of I, Mr. Price's resulting advisory range is 10–16 months. For reasons set forth in this memorandum, a sentence below this advisory guideline range is appropriate.

Mr. Price's objections to the presentence report are attached as Ex. B.

## IV.    THE RECOMMENDATION OF UNITED STATES PROBATION

The United States Probation Service concurs that a no-jail sentence is appropriate and recommends a sentence of two years of probation, with conditions including 60 days of home detention, 90 hours of community service, and other general conditions.

## V.    DEFENSE RECOMMENDATION

The defense also recommends that this Court sentence Mr. Price to a term of probation, including community service, if the Court deems that appropriate, but without any custodial sentence. For the reasons set forth below, this is "a sentence that is sufficient, but not greater than necessary," to achieve the purposes of the sentencing statute. *See Pepper v. United States*, 562 U.S. 476, 491 (2011).

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 5

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

1

2

**VI.    THE LEGAL BASIS FOR THE COURT'S WIDE DISCRETION TO IMPOSE AN APPROPRIATE SENTENCE THAT IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE PURPOSES OF 18 U.S.C. § 3553(A), IN LIGHT OF THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT AND THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.**

3

4

5

**A.    After *United States v. Booker*, 543 U.S. 220 (2005), the United States Sentencing Guidelines are Advisory Rather Than Mandatory.**

6

Commencing with *United States v. Booker*, 543 U.S. 220, 245 (2005), the Guidelines

7

are advisory.  A sentencing court is required to "consider Guidelines ranges," but is directed to

8

"tailor the sentence in light of other statutory concerns as well, see § 3553(a)."  *Id.*  Thus, under

9

*Booker*, the Guidelines are just one of a number of factors a court must weigh in crafting an

10

appropriate and just sentence under a standard of "reasonableness."  *Id.* at 262.

11

District courts may not presume the advisory Guidelines range to be reasonable, and the

12

advisory Guidelines range is to be given no greater weight than any other § 3553(a) factor.  *See*

13

*Gall v. United States*, 552 U.S. 38, 50 (2007).

14

**B.    The Court Must Impose a Sentence that Is Sufficient, but Not Greater than Necessary, to Achieve the Goals of the Sentencing Statute.**

15

16

Under the parsimony principle of the sentencing statutes, a sentencing court's

17

"overarching duty" is to "impose a sentence sufficient, but not greater than necessary, to comply

18

with the sentencing purposes set forth in § 3553(a)(2)."  *Pepper v. United States*, 562 U.S. 476,

491 (2011) (internal quotations omitted).[1]

19

20

---

[1] Section 3553(a)(2) states that such purposes are to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

21

22

23

Section 3553(a) further directs the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"; the kinds of sentences

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 6

A sentencing judge is required to consider the relevant Guideline provisions, but must also consider the § 3553(a) factors to determine a "reasonable" sentence.  *See Gall v. United States*, 552 U.S. 38, 49–50 (2007).

> The Guidelines are not the only consideration . . . . Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. *See id.*, at 351, 127 S. Ct. 2456. He must make an individualized assessment based on the facts presented.

*Id.* (footnote omitted).

Even before *Booker*, the Supreme Court recognized that "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  And, as emphasized in this Circuit, "[s]entencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime."  *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012).

## VII.    THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Section 3553(a) requires the Court to consider the "the nature and circumstances of the offense" as well as "the history and characteristics of the defendant."

---

available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 7

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98102-2605
(206) 623-6501

1541170.docx

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

A.    **Early Life**

Russell "Wayne" Price was born in Long Beach, California in 1955 to Russell ("Jerry") and Verna Price.  He grew up in a close-knit family with his two sisters—Colleen and Leslie—and an extended family that lived within a 20-mile radius.  Wayne was close with his cousins and the extended family spent many holidays together.

His cousin Beverly Altman writes:

> All the Price cousins (14) grew up together.  We worshipped at the same church, vacationed together, and worked even as teenagers at the same family business.  This exceptionally close family came as a result of our God-Fearing and God-Honoring Grandparents.  Their solid foundation made us strong.  Even [as] kids, Wayne was the responsible one.  You could count on him to look out for you and he was the one to notice what needed to get done.  While the rest of the cousins swam in Grandma's pool, Wayne cleaned it.  Every few days, Wayne would drive over, skim the pool, check the filter and then visit with our grandparents… He continued to do this until they passed.

Ex. C (Beverly Altman Letter).

Wayne enjoyed camping and fishing.  He was also part of a softball team organized through his church.

B.    **Long Beach Shavings Company**

Starting in junior high, Wayne began working at Long Beach Shavings Company (LBSC) after school and on weekends.   At that time, the company was owned by his grandparents, his two uncles, and his father.

In 1973, Wayne graduated from high school and began working full-time for LBSC.  For the next 40 years, Wayne continued to work at the company, primarily in production (producing bales and overseeing the day and night production shifts), trucking the baled shavings, and dispatching trucks to pick up raw shavings and distribute the baled product.  His niece Kari Chandler writes, "Wayne grew up tirelessly working for the Price family business.

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 8

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

He poured his entire life into being a loyal, conscientious, and dutiful employee." Ex. D (Kari Chandler Letter).  His sister Leslie Eynon adds:

> Wayne has shown me that he was dedicated to Long Beach Shavings Co.  He treated his customers with so much care.  He was diligent and focused o[n] making his division thrive.  He even took his work with him while on vacations. I was proud of his commitment to his job.

Ex. E (Leslie Eynon Letter).

In 2013, LBSC decided to relocate its operations to Texas, and Wayne resigned so that he could stay in California.  Shortly thereafter, Wayne started his own company called Pacific Coast Shavings.  Wayne never wanted to leave his employment at LBSC and start his own company—he would not have done so had it not been for the decision by the LBSC owners to move the company out of state.

Wayne runs Pacific Coast Shavings by himself and is the only person on payroll.  He is a middle man between wood shavings manufacturers and customers who want to purchase wood shavings.  His day-to-day consists of spending time on the phone taking orders from customers and arranging for the pick-up and delivery of the product via various trucking companies.  Wayne works with approximately seven manufacturers from Northern California and Canada and has about 50 customers who are located in California, Arizona, Texas, and Oklahoma.  He also handles the accounts payable and receivable.  On average, Wayne works 50–60 hours per week.

**C.    Personal Life**

Wayne married Cheryl in 1976 and together they have two children—Corrie (now aged 30) and Chad (now aged 28).  To this day, Wayne and Cheryl reside in the modest 1600 square

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

foot residence in Lakewood, California that they purchased together in 1977.  Their home is pictured in the photograph (middle) below:



Corrie writes:

> My dad is the most selfless person I know.  He has never lived outside of his means, or put our family in debt.  I can't even remember a time that he has ever bought anything for himself.  He works tirelessly to provide for us and is truly the glue to our family.  I am proud to say that with his example, I was able to work hard, sometimes two jobs, and earned enough to purchase my first home on my own this year.

Ex. F (Corrie Price Letter).

Wayne and his family regularly attended church on Sundays and enjoyed camping, fishing, and boating.  Wayne coached Corrie's softball team and Chad's little league baseball team.  Wayne and Cheryl were very involved in their children's lives, attending all of their school and sporting events.  Cheryl describes Wayne as a good father who "taught [Corrie and Chad] honesty, integrity, respect, confidence, and mostly what it means to be a Godly person."  Ex. G (Cheryl Price Letter).  Chad describes his father as his "hero and inspiration."  Ex. H (Chad Price Letter).  Corrie, who works in the automotive advertising industry in Southern California, also has found a lot of inspiration in Wayne.  She writes:

> Over the years, my dad has taught me that if I work hard, I can do anything I set my mind to.  I have been very blessed to have such extraordinary example in my life to help me become a self sufficient adult.  From teaching me to balance my checkbook to the penny, to never being in debt, and having a successful career,

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 10



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1
2

        I have my dad to thank.  My employer can see my positive work ethic, integrity, and loyalty toward my job, all of which I have learned from my dad's example from working with him in the past.

3   Ex. F (Corrie Price Letter).

4           Wayne and Cheryl remain committed and close to their children today.  Corrie resides

5   nearby in Long Beach and Chad resides with Wayne and Cheryl.  Chad has an eight-year-old

6   daughter, Leah, who currently resides with Wayne and Cheryl half of the time, and has resided

7   with them in some capacity most of her life.  Wayne and Cheryl assist Leah with her

8   homework—she just started the first grade—drive her to and from school, pack her lunch, and

9   assist with all her needs.  Cheryl describes Leah as a "grandpa's girl."  Ex. G (Cheryl Price

10  Letter).  She writes that Wayne "plays card games and reads books with her, takes her to the

11  park and helps transport her to and from school or to her mom's house."  Ex. G (Cheryl Price

12  Letter).

13          Earlier this year, Chad, who is 28 years old and had been working as a phlebotomist at

14  Long Beach Memorial Hospital and as a valet parking attendant, went to the emergency room

15  for a severe earache.  The ER staff gave him medications and sent him home; however, when

16  the pain had not subsided by the next day, he returned to the ER.  He was sent home without a

17  diagnosis.  Wayne took Chad to an ear, nose, and throat doctor, who told Wayne to take Chad

18  back to the hospital for specific tests.  When the test results came back, Chad was diagnosed

19  with acute lymphoblastic leukemia, a type of cancer that affects the white blood cells in the

20  bone marrow.  He was immediately hospitalized and remained in the hospital for months.

21
22
23

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 11

The prognosis for acute lymphoblastic leukemia in young adults is very difficult, with an overall cure rate of around 40%.[2]  Wayne and Cheryl have been by Chad's side throughout treatment, offering physical, mental, emotional, and financial support.  Corrie writes:

> In July of this year, my brother was diagnosed with Acute Lymphoblastic Leukemia, a type of cancer that is rare for adults to get.  Thankfully he was transferred to one of the best cancer research hospitals in California, which happens to be about 30 miles each way from our homes.  My dad often takes my brother to and from the hospital sometimes up to 5 or 6 times a week.  When my brother has to stay in the hospital, my dad goes to visit him just about every single day.  Since my brother has been sick, my dad has taken on the responsibility of taking his daughter [Leah] to go see him in the hospital, to and from school, as well as watch her while she stays over at his house, which she lives at 50% of the time

Ex. F (Corrie Price Letter).

After another prolonged stay in the hospital, Chad is now home with Wayne and Cheryl recovering from a stem cell bone-marrow transplant.  According to his doctor, "Chad's treatment and recovery require him to have a full time caregiver.  Mr. Russell Wayne Price, Chad's father, is his caregiver."  Ex. I (Dr. O'Donnell Letter).  Below is a photograph of Wayne helping Chad during a chemotherapy session at the hospital.

---

[2] Leukemia – Acute Lymphocytic (Adults), American Cancer Society, http://www.cancer.org/acs/groups/cid/documents/webcontent/003109-pdf.pdf  (last accessed Nov. 14, 2016).

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 12



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Wayne will assist Chad in closely following guidelines to reduce the risk of life-threatening infections and other complications (this includes keeping the house extremely clean), helping Chad take all his medications exactly as prescribed (this includes filling and picking-up medications), grocery shopping, assuring that Chad eats healthy foods (including cooking Chad's food and following safe eating and food handling instructions), and monitoring any signs of infection.  It is common for patients to re-enter the hospital to be treated for side effects after a transplant.  There will be a serious risk of infection throughout Chad's life.  Chad will be taking anti-rejection drugs, which weaken the immune system to keep it from destroying new cells.  A weaker immune system increases the risk for infection.  Wayne will continue to assist Chad in travelling to and from the hospital for follow-up care.  It is currently expected that Wayne will be required to take Chad to the City of Hope Hospital about 3–4 times per week.

Chad does not have private insurance and is relying on Medicare and Medi-Cal to cover some of the costs associated with his cancer treatment.  Chad's inability to work has significantly increased the financial pressure on Wayne and Cheryl, who are not only paying

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 13

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

for their son's living expenses, but will likely need to assist with payment of enormous medical bills as well.

Wayne and Cheryl have been instrumental in ensuring that Chad's needs are met during this most difficult time. Chad writes:

> I need him for financial, emotional, and physical support for the next year. I have a long road ahead with my transplant upcoming (I am in the hospital currently 10-17-16). No one else will be able to take his place. He is a good, honest man that goes out of his way to help his family anyway he can. Wayne selflessly helps me on a daily basis as I am unable to do a slue (sic) of day to day tasks.

Ex. H (Chad Price Letter).

Joseph Van Beers, Wayne's brother-in-law, has also acknowledged Wayne's commitment to Chad. He writes:

> When his son was diagnosed with leukemia our whole family was devastated. When the family was told Chad has a 50% or less survival rate, Wayne quickly took it upon himself to get Chad into one of the best hospitals in the U.S. that treat Acute A.L.L. Leukemia. It's a daily battle for Chad but Wayne is there to encourage and support him. Chad is very dependent on his dad both financially and emotionally.

Ex. J (Joseph Van Beers Letter).

The letters of support (which are attached as exhibits) unanimously paint a picture of a man who is loyal, selfless, humble, caring, hard-working, and dedicated to his family. They also speak of a person who is remorseful and has strived to make amends for his wrongful conduct. Colleen Wolverton, Wayne's sister, writes:

> True character, in my opinion, is to admit when you are wrong, make amends where needed, ask and receive forgiveness and move forward a wiser and better person. This is what I believe my brother has done and who he is. I am so proud and honored to be his [s]ister.

Ex. K (Colleen Wolverton Letter).

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 14

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

VIII.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Jack Price took over full ownership of LBSC from his brother Jerry Price (Wayne's father) and brother-in-law Don Black in 1997, and in 2004 he made his children Marlene Wilson, Chris Price, and Alison Vanderelst part owners of the company.  Wayne and Bill Lonn were not made a part of this ownership group.

Mr. Lonn was in charge of running the Hoquiam plant, which manufactured the Premium Pak product, while Wayne was integral to the operations at the headquarters in Long Beach.

In 2006, Mr. Lonn approached Wayne about an arrangement he had come to with Mary's River Lumber, which provided the raw materials from which Premium Pak was made. Mr. Lonn explained that Mary's River would provide the shavings to Mr. Lonn at no charge, so long as he agreed to keep the shavings bunker cleared out.  Mr. Lonn further reported to Wayne that he had discussed this offer with Jack Price, but that Jack did not want to take on the responsibility of keeping the bunker clear and thus did not want to accept the offer of free shavings.  *See* Ex. L (Polygraph Report).  Mr. Lonn suggested he could form a company that would take on this contract with Mary's River, and that the company could sell the shavings to LBSC for less than LBSC was currently paying.[3]  In return, Mr. Lonn and Wayne could make some money for their retirement.  Importantly, Mr. Lonn told Wayne that he had vetted this business model with an attorney, and that there were no concerns.  *See* Ex. M (Polygraph

---

[3] It is worth noting that after Bill Lonn was fired and LBSC directly negotiated a contract with Mary's River to pick up green shavings, the cost per load was more than what Mr. Lonn had charged LBSC.  *See* MRL_00006.

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 15

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

1  Report).  Mr. Lonn decided to call the company M&R Lumber, and he told Wayne that he was

2  going to get everything up and running.

3       Mr. Lonn sent the invoices from M&R Lumber to LBSC for payment.  Each check from

4  LBSC to pay the M&R invoices required two signatures.  Sometimes Wayne would be one of

5  the signatories; sometimes he would not—Wayne was not essential to the M&R invoices being

6  paid.  Marlene Wilson, Chris Price, and Jack Price also had authority to sign checks, and they

7  *did* sign checks.  And, although Wayne did not affirmatively disclose his knowledge of M&R

8  Lumber to other LBSC employees, he also never actively hid it.  When the topic first arose

9  during a discussion with Marlene Wilson, Wayne Price fully related his knowledge of it.

10       In October 2010, LBSC discovered that Mr. Lonn was secretly selling the Premium Pak

11  product to certain customers without ever notifying LBSC, and that he was pocketing the

12  proceeds.  Wayne had no knowledge of this and had nothing to do with it.  Wayne was shocked,

13  but he did not recognize that Mr. Lonn's representations with regard to the M&R business might

14  also be questionable.

15       Then, in 2012, Wayne learned that Mr. Lonn was being investigated by the federal

16  government for a fraud scheme related to M&R Lumber.  Wayne immediately and voluntarily

17  told Marlene Wilson about his knowledge of M&R, and wondered aloud whether he should call

18  the agent investigating Mr. Lonn.  Marlene called Postal Inspector Leder, who suggested that

19  she give Wayne his phone number.  Wayne voluntarily called Inspector Leder five minutes

20  later, and met with him in person on two more occasions.  *See* MOI_000039 (November 2, 2012

21  Interview of Marlene Wilson, which ended at 6:45 p.m.); MOI_000047 (November 2, 2012

22  Interview of Wayne Price, which began at 6:50 p.m.).

23

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 16

skellenger**bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1    Very soon thereafter, Wayne agreed to pay LBSC $105,000—the amount of the

2    proceeds he had received from Mr. Lonn which Lonn said were from M&R Lumber.  Wayne

3    paid LBSC in full on December 13, 2012.  He also paid LBSC an additional $100 per week to

4    cover the income taxes that LBSC owed as a result of receiving these funds from him.

5    Wayne also determined that he should file amended tax returns, and pay the requisite

6    taxes, for the years in which he had received the funds from Mr. Lonn.  In March 2013, Wayne

7    filed amended tax returns for the years 2006–2011, and paid all of the taxes (less than $40,000),

8    plus interest and penalties, owing on the funds that he had received from M&R.  Notably,

9    Wayne did so in spite of the fact that he no longer had any of this "income"—he had given it

10   all to LBSC in 2012.

11        A.    **Wayne Price Made His Peace With LBSC Before LBSC Precipitously Moved Its Operations To Texas.**

12   Importantly, Wayne made his peace with LBSC in 2012.  And LBSC made its peace

13   with Wayne.  Wayne paid the money he had received from Bill Lonn to LBSC.  Wayne also

14   paid the additional $100 per month that LBSC indicated it needed to pay its tax obligation on

15   that income.  LBSC asked Wayne to remain as an employee with the company after the M&R

16   situation was resolved and after he paid the money to LBSC.  In her January 27, 2016, interview,

17   Marlene Wilson, part owner of LBSC and daughter of Jack Price, provided the following

18   reasons for that decision:

> Wilson said that LBS decided not to fire Wayne Price for his involvement in
> M&R Lumber.  She said this was because Price offered to pay back the money
> he took, and the fact that Price was very knowledgeable in the shavings business.
> . . .  Wilson said she drafted a letter to the US Attorney's Office indicating she
> did not want Price prosecuted for stealing money from LBS.

MOI_000094 (January 27, 2016, Interview of Marlene Wilson).

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 17



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

1    Chris Price, another part owner of LBSC and the son of Jack Price, also send a letter to

2    the U.S. Attorney's Office expressing his desire that Wayne not be prosecuted: "For many good

3    reasons, I respectfully request that [Wayne] not be criminally prosecuted."  LBS_001929 (May

4    20, 2013 Letter from Chris Price to AUSA Werner).

5    Jack Price, the President and patriarch of LBSC, sent this letter to the United States

6    Attorney's Office in May 2013:

7    May 14, 2013

8    Brian Werner
9    Assistant United States Attorney
10   1201 Pacific Ave, Suite 700
     Tacoma, WA 98400-4305

11   Re: Investigation of Russell Wayne Price

12   Dear Mr Werner:

13

14   I am the President and majority shareholder
     of Long Beach Shaving Co Inc. (the "Company").
15   I am writing on behalf of the company and
     its Board of Directors, which approved its request.

16

17   As you know, this is a family-owned business
     founded by my father Russell L. Price, Sr,
18   who is Wayne's grandfather. Wayne's father
     Russell L. Price, Jr. ("Jerry") is my brother
19   and is a former shareholder in the Company.
     Starting with the Company as a teenager,
20   Wayne has worked with me and other
21   members of our family for over 40 years.

22   Wayne has admitted his involvement in
     the brokerage known as M&R Lumber (M&R)

23

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 18

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

I was surprised and felt betrayed by his actions. It was inappropriate for Wayne and Bill to hide their ownership of M&R from the Company. To the extent that Wayne profited from his failure to disclose his ownership of M&R to the Company, he has already forfeited those profits. In addition, he has been disciplined by the Company through loss of his check signing authority serving three (3) weeks of unpaid administrative leave and he's in the process of paying the Company for the additional tax it owes because of his forfeited profits. Wayne agreed to this. I'm attaching the December 10, 2012 agreement (the "Agreement") between Wayne and the Company for your review.

Wayne's prosecution would hurt many of the family business members my father started. I'm willing to show him mercy and request that he not be criminally prosecuted.

Sincerely,
Jack Price

Then, later in 2013, Jack Price inexplicably decided to move LBSC to Conroe, Texas. Many of the long-time LBSC employees, including Wayne, were not willing to leave their homes, children, and life-long ties to the Southern California community to follow Jack to Texas. Wayne, his cousin Marlene Wilson, his daughter Corrie Price, and his niece Jolene Regnier resigned to pursue their own careers where they lived, in Southern California. Ms.

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 19

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

Wilson is now a registered nurse for Care Choice in Fullerton, California.  Wayne continued doing what he has done his entire life: he remained in the wood shavings business by starting his own company, Pacific Coast Shavings, which he operates today.

It was only after Wayne declined to move to Texas with LBSC that the LBSC employees radically changed their tune toward him, undertaking a number of steps to try to ruin Wayne's new business by actively dissuading folks from doing business with him.  LBSC has contacted some of Wayne's current customers to inform them that Wayne will be incarcerated later this year and will no longer be able to serve his customers' wood shavings needs.  Some of the tactics—which continue to this past week—include making telephone calls and sending correspondence to Pacific Shavings' suppliers, falsely informing the suppliers that these legal proceedings will soon put Wayne out of business.  *See, e.g.*, the LBSC email to one of Wayne's current customers claiming that Pacific Coast Shavings "is in deep trouble with the law for stealing 2.2 million dollars from our company."  Ex. N (June 22, 2016 Email from LBSC to Walkers Feed and Farm).

One of LBSC's other tactics has been to try to put pressure on the United States Attorney's Office to put Wayne in jail and put him out of business.  The following is the text of a voicemail left for Assistant United States Attorney Brian Werner by LBSC part-owner Alison Vanderelst just days before the government agreed to dismiss the fraud and money laundering charges against Wayne Price:

> Hi Brian this is Alison Vanderelst calling.  I just wanted to just verify with you that if there's any type of plea bargaining going on with Wayne Price, one of the things that I just—to me—I—I'm just so emphatic about is being victims of what he's done—it's just that he is continuing to be in business and hurt the company even more than what he's already done.  And I think that, if anything, —of any type of an agreement—it would *have* to be that he would *have* to be completely out of this type of business.  I mean that's just my thoughts.  That he

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

1
2
3

would have to be *completely* out of doing any type of business—at all—in the same industry that we're in.  You know, but anyway.  I just—I just thought I— I would let you know that that's kind of where we're thinking and that's what our thoughts are.  You can call me if you want, my cell is ████████.  Thank you, bye-bye.

4   August 10, 2016, Voicemail from Alison Vanderelst to AUSA Werner.

5         In a government interview earlier this year, Chris Price, the son of Jack Price, tried to

6   explain a rationale for his change of mind about the prosecution of his cousin Wayne:

7
8
9

Price said he remembered writing a letter in 2013 to the US Attorney's Office indicating he did not want Wayne prosecuted for stealing money from LBS. Price said at the time he did not want Wayne prosecuted because he was valuable to LBS, and he paid back the money he stole. Price said he later changed his mind after Wayne left LBS.

10  MOI_000077 (February 2, 2016, Interview of Chris Price).

11        The truth is that a jail sentence of any length for Wayne Price would achieve what the

12  LBSC owners have been hoping and advocating for:  the end of Wayne Price's business.  His

13  business would fail because, if Wayne Price is not there to answer the phone to take orders,

14  contact suppliers, and dispatch the trucks, his customers would be forced to go elsewhere.

15        **B.     The Government's Statement of the Offense Conduct in its Sentencing
                Memorandum is Unfair.**

16        The "Nature and Circumstances of the Offense" section of the government's sentencing

17  memorandum consists of twenty sentences.  Only one of these twenty sentences—"And he

18  failed to report the M&R Lumber money on his tax return"—concerns the crime to which

19  Wayne actually pled guilty.  The other nineteen sentences in this "Offense" section describe the

20  criminal charges that the government has agreed to dismiss, *not* the crime to which he pled

21  guilty.  While these other 19 sentences might fairly describe the crimes that Bill Lonn has been

22  convicted of, they are not a fair description of the single crime—filing a false tax return—of

23  which the government chose to convict Wayne.

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 21



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

Importantly, neither the Amended Superseding Information nor the Plea Agreement contain any allegation that *Mr. Price* knowingly submitted false or fraudulent invoices to LBSC. Indeed, the Superseding Information (Dkt. No. 102) had to be corrected by the *Amended* Superseding Information (Dkt. No. 103), filed just one day later, in order for the government to delete the incorrect allegation that Mr. Price had submitted false and fraudulent invoices. *Compare* Superseding Information at Par. 5 ("RUSSELL WAYNE PRICE and Willis Lonn, Jr., submitted materially false and fraudulent invoices") *with* Amended Superseding Information at Par. 5 ("Willis Lonn, Jr., submitted materially false and fraudulent invoices").

Mr. Price received some of the proceeds from Mr. Lonn and failed to timely pay his taxes on that income.[4] While Mr. Price also countersigned the checks that paid the invoices (each check required two authorized signators), it is clear that any of the persons with authority would have signed (and in fact, *did* sign) the checks regardless of Wayne. Indeed, when Wayne was not available, two *other* signators signed the checks.[5] In the absence of Wayne—i.e., if Wayne had been hit by a bus the day before the first invoice arrived—everything would have occurred in exactly the same fashion.

---

[4] Indeed, why Bill Lonn made the unilateral choice to divide the M&R proceeds and share a portion of them with Wayne is somewhat puzzling. There really was no objective reason for him to do so. According to what Mr. Lonn said, Mr. Lonn apparently felt that he and Wayne—who were both very important to the success of LBSC—had been unfairly left without any retirement plan whatsoever to secure their financial future, while the other side of the family (Chris, Alison, and Marlene) ended up with an equity interest in LBSC to secure their retirement future.

[5] The government's suggestion that Wayne's signature on the checks was culpable behavior is belied by the uncontradicted evidence that the checks to M&R were signed by whichever managers happened to be available in the office at the time. *See, e.g*., MOI_000050 (September 19, 2013 Interview of Wayne Price) ("[T]he checks were signed based on which managers were available in the office at the time.").

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 22

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Yet, curiously, the entire thrust of the government's memorandum is focused on the crimes proved against Bill Lonn at his trial, not those proved against Wayne. If necessary, Wayne was prepared to go to trial on these crimes, and with a very robust and markedly different defense than Bill Lonn's. Since the government declined the opportunity to prove beyond a reasonable doubt that Wayne committed these crimes, it should not now be heard to ask the Court to sentence him for them. *See* Christopher Nalls, *Bait and Switch: Criminal Sentencing from A Due Process Perspective*, 27 T. Jefferson L. Rev. 159 (2004) ("Plainly stated, a criminal defendant has the right to be sentenced for the crime, and only that crime, to which he has pleaded guilty or has been found guilty by a jury beyond a reasonable doubt.") (citing *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("It is as much a violation of due process to send an accused to prison following a conviction on a charge on which he was never tried as it would be to convict him upon a charge that was never made.")). While this is how the justice system might operate in some other countries, this practice is not consistent with the highest traditions of the American criminal justice system, and it is unfair.

## IX.    ACCEPTANCE OF RESPONSIBILITY

Mr. Price has pled guilty to filing a false tax return, a violation of 26 U.S.C. § 7206(1), and, by his words and actions, accepted responsibility for this misconduct. A two-point reduction pursuant to § 3E1.1(b) is warranted. Mr. Price's letter to the Court accepting responsibility for his conduct is attached as Ex. A.

## X.    RELATED DEFENDANT

The other defendant related to this case is Willis "Bill" Lonn. Mr. Lonn was charged with numerous counts unrelated to Wayne Price, and, as this Court is well aware, Mr. Lonn

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1    elected to have a trial rather than plead guilty.  A jury found Mr. Lonn guilty of all 13 counts

2    with which he was charged.  Mr. Lonn is scheduled to be sentenced on January 9, 2017.

3            Wayne's involvement with Mr. Lonn's activity is reflected in the fact that the

4    government chose to dismiss all of the fraud and money laundering charges against Wayne

5    rather than risk an acquittal of him at trial.  Wayne relied upon Mr. Lonn's representations

6    regarding the legitimacy of the M&R business, and believed it had been vetted both with Jack

7    Price and with an attorney.  *See* Ex. L–M (Polygraph Reports).

8            Wayne did not do anything except receive part of the money and provide a second

9    signature on some of the checks paying the invoices.  Wayne had nothing to do with Mr. Lonn

10   selling Premium Pak product out the back door and keeping the funds for himself; Wayne had

11   no idea that this even occurred.  Bill Lonn alone did this.  Wayne had nothing to do with Bill

12   Lonn using deceased persons' social security numbers to set up fake companies; Wayne had no

13   idea that this even occurred.  Bill Lonn alone did this.  Wayne Price had nothing to do with Bill

14   Lonn setting up unauthorized bank accounts; Wayne had no idea this even occurred.  Bill Lonn

15   alone did this.

16   **XI.    A SENTENCE OF PROBATION IS SUFFICIENT, BUT NOT GREATER THAN
             NECESSARY, TO ACHIEVE THE PURPOSES OF 18 U.S.C. § 3553(A)**

17

18           As soon as Wayne learned that there might be problems with M&R, three years before

19   this case was filed, he voluntarily called United States Postal Inspector Jeremy Leder to tell him

20   everything he know about M&R.  At that same time, Wayne voluntarily gave LBSC all the

21   money he had received from Bill Lonn from M&R, plus additional funds for the taxes M&R

22   would have to pay on this new income.  Two years before this case was filed, Wayne filed

23

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

amended tax returns for every year he had received money from M&R, and paid his taxes in full, as well as any late penalties and interest.

A prison sentence now—nine years after the offense conduct began and four years after the offense conducted ended, and two years after Wayne finished taking every step he could to correct what he had done wrong—will serve no constructive purpose.  *See, e.g.*, *Coleman v. Balkcom*, 451 U.S. 949, 952, (1981) (Stevens, J., concurring in denial of certiorari.) ("The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted.").

### A.    Mr. Price's Extraordinary Family Ties and Responsibilities Support the Recommended Sentence.

Although family ties and responsibilities are "not *ordinarily* relevant in determining whether a departure may be warranted," U.S.S.G. § 5H1.6 (emphasis added), extraordinary familial responsibilities may support a below-guideline sentence.  *See, e.g.*, *United States v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003) (downward variances based on §5H1.6 "generally involve situations where the defendant is an irreplaceable caretaker of children, elderly, and/or seriously ill family members"); *see also United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (affirming sentence of five years of supervised release with no jail time, despite the fact that the defendant's Guidelines range was 41–51 months, where trial court considered, *inter alia*, the defendant's responsibility for his daughter); *United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) (affirming probationary sentence in case arising from misuse of government credit card and loss amount of between $350,000 and $500,000, noting defendant's responsibility, as a single parent, for a young child).

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 25

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

1     Here, Wayne has the extraordinary responsibility of caring for his 28-year-old son Chad

2 and Chad's 8-year-old daughter, while Chad is seriously ill.  Wayne is the primary caregiver

3 both in terms of ensuring that Chad has his physical needs met, and also in ensuring that Chad

4 is able to pay his substantial medical bills for his ongoing care.

5     During periods when Chad is recovering at Wayne's home, Wayne balances managing

6 his full-time business with driving Chad to the City of Hope medical center, 30 miles away, for

7 testing and treatment.  Although Wayne's wife and Chad's mother, Cheryl Price, is also present

8 and assists with Chad's care, she is not able to take on the entirety of the financial, physical,

9 and logistical burdens of caring for Chad during his recovery, while she focuses on providing

10 a caring and loving home environment for their granddaughter Leah.  Wayne's extraordinary

11 responsibilities to his family support the recommended sentence, a modest downward variance

12 from the guideline range.

13     **B.      Recidivism Rates Suggest that Individual Deterrence is not a Necessary
            Requirement of this Sentence.**

14

15     Section 3553(a)(1) requires the court to take into account the characteristics of the

16 defendant.  Wayne is 61 years old.  Statistically, the risk that he will commit criminal acts in

17 the future is extremely low.  For all male offenders in Criminal History Category I, the

18 recidivism rate is 15.2%.  By contrast, for offenders in Criminal History Category I who are

19 over 50 years of age, the rate is 6.2%.  *See* U.S. Sentencing Commission, *Measuring*

20 *Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, pp. 28–

21 29.  Notably, the guidelines themselves recognize that under certain circumstances age may be

22 a valid departure factor.  *See* U.S.S.G. § 5H1.1.

23

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 26

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

The appropriateness of considering a defendant's advanced age and the attendant reduction in risk of recidivism has been recognized.  *See, e.g.*, *United States v. Hamilton*, 323 Fed. App. 27, 31 (2nd Cir. 2009) (finding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (approving of district court's below-guidelines sentence where defendant would be middle-aged at the time of his projected release from prison).

Wayne has lived a life free of any criminal activity and his statement to the Court emphasizes his remorse for this conduct.  It seems inconceivable that he will commit any crimes in the future.  Wayne's age supports the recommended sentence.

## C.    Collateral Consequences of Conviction

This prosecution has had a tremendous impact on Wayne, and the stigma of a felony conviction, regardless of any sentence imposed, will be with Wayne forever.  *See United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive.").   "[F]elony convictions continue to expose individuals to a wide range of collateral consequences imposed by law that affect virtually every aspect of their lives." *United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *5 (E.D.N.Y. May 24, 2016), *appeal withdrawn* (Sept. 9, 2016).

> Remarkably, there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons. Of those, federal law imposes nearly 1,200 collateral consequences for convictions generally, and nearly 300 for controlled-substances offenses. District courts have no discretion to decide whether many of these collateral consequences should apply to particular offenders. The result is a status-based regulatory scheme; by the very fact of an individual's conviction, he or she is subject to a vast array of restrictions.

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 27

1    *Id.* (internal citations omitted).

2        Wayne may be denied social benefits (including Social Security Act benefits), will lose

3    his right to vote and will be excluded from other important civic duties, such as serving on a

4    jury.

5        In addition to the stigma of having been convicted of a felony and the automatic loss of

6    rights due to such a conviction, it would be detrimental to Wayne and his family's livelihood

7    should he be sentenced to serve any term of imprisonment.  Wayne would lose his business and

8    with it, the financial means his family relies on.

9        Wayne has expended great effort and time to establish and run a successful business to

10   support his family, an accomplishment LBSC has continually attempted to undermine.  As

11   noted above, LBSC employees have also asked the United States Attorney's Office to find a

12   way to put Wayne Price out of business.

13       Wayne's biggest regret—far beyond the impact that this has had on his personal

14   reputation, and far beyond the impact that this has had on his business—is that his conduct

15   might ultimately impact his ability to be with and care for his son and granddaughter as his son

16   faces the toughest battle of his life.  For Wayne, to be away from his family for even one day

17   under these circumstances would be a severe punishment indeed.

18       The financial burden on Wayne of these legal proceedings has also been profound.

19   Since 2014, Wayne Price has paid for his own lawyer to face this government investigation and

20   prosecution rather than rely on the federal court to fund his legal defense.  This has been an

21   enormous financial burden for Wayne and his family.

22

23

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 28

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

## XII.   CONCLUSION

2      Wayne recognizes that it was his own actions (or more accurately, his *inaction*) that

3  have led him to appear before this Court for sentencing.  Yet long before he ever appeared in

4  any court, Wayne voluntarily made every attempt to correct what he could by both giving to

5  LBSC all of the monies he received from M&R, and then paying to the Internal Revenue Service

6  all of the taxes, interest, and penalties on those funds (even though he no longer possessed those

7  funds).[6]  The IRS has been more than compensated for this failure to pay taxes.

8      Under these circumstances, a sentence of confinement is greater than necessary to fulfill

9  the purposes of the set forth in § 3553(a)(2).  Instead, a sentence of probation will recognize

10  that Wayne has long ago taken substantial steps in rectifying his conduct, and will allow Wayne

11  to continue to demonstrate to this Court and to his community that this offense conduct was

12  inconsistent with his life-long character.

13      For all of the foregoing reasons, Mr. Price respectfully requests that this Court impose

14  a sentence of probation, with no custodial component.

15      Dated this 29th day of November, 2016.

16                              s/ Peter Offenbecher
                         Peter Offenbecher
17                       Erin Curtis Newton
                         SKELLENGER BENDER, P.S.
18                       Attorneys for Russell Wayne Price

19

20

21

22

23      [6]  Indeed, the IRS has now been paid income tax twice on the same monies—once by
Wayne Price, and then again by LBSC.

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 29

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx

1

**CERTIFICATE OF SERVICE**

2          I, Jule Sprenger, certify that on November 29, 2016, I electronically filed Defendant

3   Price's Sentencing Memorandum (together with Exhibits A–P) with the Clerk of the Court

4   using the CM/ECF system, which will send notification of such filing to all attorneys of record.

5          DATED this 29th day of November, 2016.

6                                        s/ Jule Sprenger
                                     _____
7                                    Jule Sprenger
                                     SKELLENGER BENDER, P.S.
8                                    Paralegal

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

DEFENDANT PRICE'S SENTENCING
MEMORANDUM – 30

skellenger**bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1541170.docx